**HELLENIC LINES, Ltd., owner of THE S.S. HELLENIC BEACH, Libelant,**

v.

**THE EXMOUTH, her engines, boilers, etc., and American Export Lines, Inc., Respondent.**

**AMERICAN EXPORT LINES, Inc., as owner of THE S.S. EXMOUTH, Libelant,**

v.

**THE HELLENIC BEACH, her engines, boilers, etc., and Hellenic Lines, Ltd., Respondents.**

Nos. 19244, 19486.

United States District Court
E. D. New York.

Sept. 28, 1955.

Dow & Symmers, New York City, proctors for Hellenic Lines, by Wilbur E. Dow, Jr., New York City, Advocate.

Haight, Deming, Gardner, Poor & Havens, New York City, proctors for American Export Lines, by James M. Estabrook, and Walter A. Darby, New York City, Advocates.

Bigham, Englar, Jones & Houston, New York City, proctors for petitioners, by Charles A. Van Hagen, Jr., New York City, Advocate.

RAYFIEL, District Judge.

Shortly after 2:00 A. M., on June 5, 1949, a collision took place between two vessels, the "Exmouth" and the "Hellenic Beach", in the vicinity of Overfalls Lightship, at the mouth of Delaware Bay. The "Exmouth" was bound from New York to Philadelphia, with 300 tons of cargo aboard; the "Hellenic Beach" was bound from Philadelphia to New York, and was carrying 5,000 tons of cargo.

The "Hellenic Beach" filed a libel against the "Exmouth", which, in turn, filed its cross libel. The owners of the cargo on board the "Exmouth" intervened, and the parties stipulated "That if the suit and the cross suit between the owners of the S.S. Exmouth and the S.S. Hellenic Beach should result in a decision of sole fault on the part of the Hellenic Beach, or mutual fault on the part of both vessels, that the cargo intervenors shall be entitled to an appropriate interlocutory decree in their favor * * *."

The "Exmouth was a vessel of the type known as a Victory ship. She was 439 feet long, with a beam of 63 feet. Her engines developed 8500 horsepower, which gave her a maximum speed of about 17 knots. The "Hellenic Beach" was of the type known as a Liberty ship. She was 422 feet long, with a beam of 57 feet. Her engines developed 2500 horsepower, which gave her a top speed of about 10½ knots.

While it had been foggy earlier that night, the visibility at the time of the collision was about five miles. There was some wind, a slight swell, and the tide was at flood, running northwest at over two knots.

The "Exmouth" had run into the fog earlier that night, and had anchored about a mile southwest of Overfalls Lightship. At about 1:42 A. M., the fog having lifted, she heaved up anchor.

At about 1:51 A. M. she was under way at her full maneuvering speed, which was about 12 knots, and proceeded on a course of about 285 degrees past the Overfalls Lightship. Her master, Captain Ecklund, was on her bridge, directing her navigation. With him were the third mate, Bernard E. Griffin, who was the officer on watch, and Whitney, the helmsman. The first officer and a lookout man were at the bow, acting as lookouts.

The "Hellenic Beach" had dropped her pilot at 1:50 A. M. At 1:52 A. M. the order was given for full speed ahead, and she proceeded on a course of 124 degrees true to pass Overfalls Lightship on her left. She was being navigated from her flying bridge by Captain Macris, her master. With him were the second mate and a helmsman. A lookout was stationed on the forecastle.

Captain Ecklund testified that just as he passed the Lightship he ordered the helmsman to swing left to 311 degrees, and then went into the chartroom for a few seconds. When he emerged from the chartroom he saw a vessel which proved to be the "Hellenic Beach". He observed her masthead light, range light and red port side light bearing about 45 degrees on his starboard bow, and about a mile off. He stated that he ordered the helmsman to swing hard left, and he blew two sharp blasts of the whistle, thinking that the vessels would cross port to port. Instead of carrying out his order the helmsman said: "You mean right captain," and the third mate (Griffin) said "hard right, hard right," (SMP 117) which Captain Ecklund testified that he did not want, and ordered the helmsman to go hard left, with which order he complied. At that point the "Hellenic Beach" was bearing down on the "Exmouth" which, almost immediately thereafter, she struck at the Number 4 hold.

Griffin, the "Exmouth's" third mate, called as a witness by the "Hellenic Beach", testified that shortly after the "Exmouth's" anchor was heaved up and

she was proceeding at full maneuvering speed, steadied on a course of 290 degrees, he saw the lights of another vessel (the "Hellenic Beach") which was coming down from the direction of the pilot station. He estimated she was then about three or four miles from the "Exmouth". He stated that he saw her masthead, range and red port side lights; that thereafter the "Exmouth" passed the Lightship about a quarter of a mile off, and her heading was then approximately 285 degrees; that the other vessel ("Hellenic Beach") was about a mile or two away, about 45 degrees on her starboard bow; that he had called Captain Ecklund's attention to the other ship before they had passed the Lightship; that after they had passed it Captain Ecklund ordered a change of course left to 317 degrees, to which the helmsman replied: (S.M. p. 170) "You mean right captain", and that he, Griffin, then added: "Yes, that's right, you will have to come to the right". Griffin testified, further, that Captain Ecklund repeated the command to come hard left, and the helmsman obeyed the order; that at that time the ships were only half a mile apart; that he (Griffin) then went into the chartroom to check the course, and ascertained that the changes of course should have been to the right, instead of the left; that he told this to Captain Ecklund, who then ordered the helmsman to come right, but the vessels were then less than 50 yards apart; that the master blew two blasts on the whistle and gave the "hard right" order but the collision ensued.

There is no dispute that under the then existing circumstances and conditions the "Exmouth" was the burdened vessel and the "Hellenic Beach" the privileged one, for at page 21 of their brief, the proctors for the former admit that she (the "Exmouth") "unquestionably was in open and apparent violation of International Rule 19 which states 'When two steam vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other' ". The "Exmouth" not only failed to keep out of the way of the "Hellenic Beach", in clear violation of Rule 19, supra, 33 U.S.C.A. § 104, but her master navigated her in such a faulty manner as to make the collision inevitable. There was testimony to the effect that Captain Ecklund was intoxicated during his aforementioned supervision of the navigation of the "Exmouth" but, regardless of the cause of his faulty navigation, there appears to be no doubt that he operated the "Exmouth" in clear violation of International Rule 19, 33 U.S.C.A. § 104.

Let us see what those charged with the navigation of the "Hellenic Beach" were doing all this time. Captain Macris her master, testified that sometime after she dropped her pilot he saw two masthead lights and a green light of a vessel, which later proved to be the "Exmouth", from two to four points on his port bow, at a distance of about a mile and a half, and that he expected the vessel to turn right while he maintained his course and speed. As he said, (page 27 of the minutes of the trial) "Under the rules I had to hold my course and speed and the other ship had to turn right and show me the red light after I showed it to her." He stated, further, that he blew a one-blast signal when he was less than a mile away, but that there was no answer from the "Exmouth"; that at three quarters of a mile he blew another one-blast signal, and the "Exmouth" responded with a two-blast reply; that at about that point he sensed that there was danger of a collision, put his helm hard right, and signalled to the engineroom for full speed astern. The order was carried out, but almost immediately thereafter the collision took place.

On cross-examination he was questioned concerning his testimony taken by deposition on June 14, 1949, nine days after the accident and admitted that he then testified as follows: (S.M. p. 50)

"Q. I shall read to you now from page 11: 'Q. Did you blow any whistles?

A. A little while later when I first thought the distance was shorter and she did not change course as she had to I blew my whistle one blast. I wanted to tell her to keep out of my way'.

"Q. Do you remember being asked that question and making that answer? A. Yes.

"Q. Do you remember being asked this question: 'Q. How far away was she at that time, about? A. A little more than half a mile'. Do you remember that? A. If I said so I admit it."

A sketch was then offered and received in evidence, marked Respondent's Exhibit "C", showing the position of the two vessels, and containing these words in Captain Macris' handwriting: "Approximate distance one half mile " (S.M. p. 52)

The cross-examination continued: (S. M. p. 52): "Do you remember on cross-examination being asked this question, and I read to you now from page 25, about three-quarters of the way down:

" 'Q. At that time how far were you from the Exmouth in your opinion? A. About when, the second blast?

" 'Q. When you sounded your second one-blast signal? A. Maybe a quarter of a mile'.

"Q. Do you remember being asked those questions and making those answers? A. If it is there, yes."

And further, at page 53 of the minutes of the trial: "Q. Now on page 26 of your deposition I read to you and ask you if you remember being asked this question: 'Q. I think you said that your best estimate was then about a quarter of a mile,' and you were discussing then the distance between the ships at the second one blast signal, and you said: 'A. Yes, about a quarter of a mile when I blew the second blast'.

"Q. Do you remember being asked that question and making that answer? A. I don't remember but may be I said it."

Following is further testimony of Captain Macris (S.M. p. 54):

" "Q. Now, captain, you testified before the Coast Guard, did you not? A. Yes, sir.

"Q. And that was on June 8, three days after the collision? A. Yes.

"Q. Your recollection was still better then, wasn't it, than it was at the time of the deposition? A. Yes.

\* \* \* \* \* \*

"Q. Were you asked these questions at that time: 'Q. Coming to the first one-blast signal, how far were you apart? A. Perhaps half a mile.

" 'Q. What was the bearing of your ship then, was she still on the same position on your bow? A. Yes, in the same position on my port bow, maybe three points.

" 'Q. In other words, the bearing of your ship had not changed any? A. I had no time to take bearings.

" 'Q. I am speaking of your estimation watching the ship. You did not consider the bearing to be changed? A. Yes.

" 'Q. She remained on your starboard bow showing her green light? A. Yes. (Counsel agreed that there was an error in the transcription of the word "starboard" in the last question; it should have read "port".)

" 'Q. That is the time you blew one blast? A. That is right.

" 'Q. You were about a half a mile apart. A. Yes.'

"Q. Do you recall that testimony, Captain? A. Yes.

"Q. Was it correct? A. Everything that is in there is correct as to what I say." (Matter in parenthesis added).

The "Hellenic Beach", as the privileged vessel, was required, under Article 21 of the International Rules, 33 U.S.C.A. § 106, to "keep her course and speed", and had the right to expect the "Exmouth" as the burdened vessel, to keep out of her way, as she was obliged to do under

Article 19 of the International Rules, 33 U.S.C.A. § 104, C. F. Marsden's Collisions at Sea (9th Ed., 934) pp. 375–380; Le Boyteaux, Rules of the Road at Sea (1920) p. 133. But the "Hellenic Beach" was likewise bound by the International Rules, Articles 27 and 29, 33 U.S.C.A. §§ 112 and 121, respectively, which read as follows:

Article 27. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

■ Did Captain Macris, in his navigation of the "Hellenic Beach", exercise the care, prudence and judgment required of him under Articles 27 and 29, supra? In my opinion he did not. His testimony at the Coast Guard hearing and at the taking of his deposition, both of which occurred shortly after the collision, when his recollection of the events in question was undoubtedly more vivid than it was at the trial, more than five years thereafter, satisfies me that the "Hellenic Beach" and the "Exmouth" were only half a mile apart when the former sounded her first one-blast signal and only a quarter of a mile apart when the second was sounded, immediately after which Captain Macris heard the "Exmouth's" two-blast signal and ordered his vessel's helm hard right and her engines full astern. It must be noted that the vessels were approaching each other at a combined speed of over twenty knots, at night, and at a time when, by his own admission, it was difficult to judge distances. In my opinion the master of the

"Hellenic Beach" was guilty of a navigational fault when he failed to take affirmative action when the vessels were only half a mile apart. Instead of sounding a one-blast signal at that time as he did, he should have realized that the situation confronting him was fraught with imminent danger, and should have sounded the danger signal and ordered her engines full speed astern.

Captain Macris' testimony (pages 28 and 29 of the S.M. of the trial) amply supports the conclusion that when the second one-blast signal was sounded the vessels were in extremis, and yet he did nothing to avoid the collision which was then so imminent.

Proctors for the "Exmouth" argue that the decision in the case of Rivera v. American Export Lines, Inc., and Hellenic Lines, Inc., owners, respectively of the "Exmouth" and the "Hellenic Beach", holding both vessels at fault, is determinative of the case at bar. D.C., 13 F.R.D. 27. In that case, brought in the Southern District of New York, Rivera, a member of the crew of the "Exmouth" sued the owners of both vessels to recover damages for personal injuries which he sustained as the result of the aforementioned collision. He recovered a judgment of $90,000 against both defendants.

Proctors for the "Hellenic Beach" contend, on the contrary (1) that the issues in the Rivera case, differed from those in the instant case, and (2) that as a result of a conference in the Rivera case, held before Judge Irving R. Kaufman, and called for the purpose of attempting to effect a settlement thereof, a stipulation was entered into providing that the decision in the case at bar would serve to determine the Rivera case. The second point of contention may be dismissed without discussion since the Rivera case was *not* settled. It went to trial and judgment, and a verdict was rendered against *both* defendants for $90,000 half of which was paid by each defendant. No appeal was taken.

The "Hellenic Beach" proctors' first contention, to wit, that the issues in the Rivera case and the instant case are not the same, is inconsistent with the position which they took at a pretrial conference before Judge Leibell in the Rivera case, in which they sought to use certain depositions taken in the case at bar. In his decision, D.C., 13 F.R.D. 27, at page 28, Judge Leibell said: *"Rivera and Hellenic contend that the issues as to liability are identical in the two actions and that for that reason the depositions should be received in evidence in* this action" and, 13 F.R.D. at page 29, "The memoranda submitted by counsel indicate that the same negligence that resulted in plaintiff's injuries allegedly caused the damage to the vessels. *The same set of facts and circumstances operated to bring about the collision, which resulted in damage to the vessels* and the injuries to the plaintiff." (Emphasis added.)

It is apparent that Judge Leibell agreed with the argument advanced by the proctors for the "Hellenic Beach" in that case, for, in granting the application for leave to use the depositions, he said, 13 F.R.D. at page 30: "The answers of the respective defendants [the parties herein] each assert a claim over against the other for indemnity; *their interests* \* \* \* *are clearly antagonistic, to the same extent as if one were suing the other.* Under those circumstances there appears to be no good reason for denying to Hellenic Lines the right to use the depositions as part of Hellenic's proof against Export in this Rivera action." (Emphasis and matter in brackets added.) It would appear, then, that the verdict in the Rivera case is dispositive of the issues in the case at bar.

In view of the foregoing I find both vessels at fault. The intervening cargo owners are entitled to an interlocutory decree in their favor.

Submit findings of fact, conclusions of law and decree in conformity herewith.