Patricia Ann WEBB and Frances Louise Webb, t/a Webb Bunker Company, claimants of THE oil screw DEWEY, Appellants,

v.

Charles DAVIS, Appellee.

No. 7207.

United States Court of Appeals Fourth Circuit.

Argued June 18, 1956.

Decided July 20, 1956.

George Rountree, Jr., Wilmington, N. C. (Deutsch, Kerrigan & Stiles, New Orleans, La., Rountree & Rountree, Wilmington, N. C., and Francis Emmett, New Orleans, La., on brief), for appellants.

Claud R. Wheatley, Jr., and Wiley H. Taylor, Jr., Beaufort, N. C., for appellee.

Before SOPER and PRETTYMAN, Circuit Judges, and TIMMERMAN, District Judge.

SOPER, Circuit Judge.

On November 12, 1954, shortly after 7:00 A.M., in clear calm weather, a collision occurred between two fishing boats, the Dixie B and the Dewey in waters off the coast of North Carolina known as Cape Lookout shoals. The Dixie B was sunk and became a total loss while the Dewey was uninjured. The owner of the Dixie B filed a libel *in rem* against the Dewey and a libel *in personam* against her owners, alleging that the collision was caused solely by the negligent navigation of the Dewey and claiming damages for her loss. The District Judge found for the libellant and gave judgment for the value of the Dixie B, which he found to be $40,000, together with interest from the date of the loss.

The Dixie B was a wooden trawler 70 feet in length, with a beam of 18.5 feet, drawing 7½ feet of water and

powered by a 170 H.P. diesel engine. She was manned by a master and two deckhands and was engaged in shrimp fishing. The Dewey is a menhaden vessel, 105 feet in length, 22 feet in beam and draws 7½ feet of water.

Along the shore of Cape Lookout in this area are shoals through which there is a channel or passageway known as the slough, which broadens from south to north and is marked by buoys. The northernmost buoy is a quick flashing green buoy and a mile to the south lies a black and white nun buoy which marks the center of the channel. South of the nun buoy the channel bears to the west. The collision occurred about half-way between these two buoys on the western side of the channel, which at this point is 400 yards wide.

Just before the collision the Dixie B was proceeding south through the slough in search of suitable fishing grounds, preceded at a distance of 150 yards by the Evelyn D. Smith, a vessel also engaged in shrimp fishing. The vessels were proceeding at the rate of 8 miles per hour. As they reached a point south of the green flashing buoy, keeping to the west side of the channel, they saw the Dewey approaching the black and white buoy from the west. There was ample room for the vessels to pass in safety after the Dewey passed the buoy, but after rounding the buoy instead of straightening out and heading for the green buoy she continued in an arc-like curve to the west without slackening speed and without warning struck the Dixie B amidships, penetrating her to a depth of 5 feet so that she filled with water and sank. Owing to the nature of the bottom she broke up on the shoals and was a total loss.

Prior to the collision the Dixie B altered her course slightly to starboard but did not slacken her speed, and in accordance with local custom, as there was no apparent danger, she gave no passing signal or whistle signal of any kind. The point of collision was about half-way between the two buoys, west of the center and near to the western edge of the channel. If the Dewey had continued on her curving course without interruption she would have run aground at a point a short distance from the point of collision.

Negligent navigation on the part of the Dewey is conceded. Indeed the District Judge found on substantial evidence that there was no one in her pilot house at the time of the catastrophe; and she offered no testimony whatsoever in explanation of her extraordinary behaviour or in support of her only defense that the Dixie B was also at fault and, therefore, the damages should be divided. The contention of the Dewey is that, whatever her fault, the Dixie B was also blameworthy because she failed to observe the rules of navigation applicable to the situation in which she found herself; and hence the teaching of The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, is invoked that when a vessel in collision has broken a statutory rule she must show not only that her breach did not contribute but that it could not possibly have contributed to the collision.

Some uncertainty arose during the trial as to whether the general rules of navigation for inland waters or the international rules for navigation on the high seas were applicable under the circumstances of this case. The boundary line which separates the inland waters on the Atlantic Coast from the high seas has been established in this country under the authority of 33 U.S.C.A. § 151, and is set out in 33 C.F.R. Part 82. The line of demarcation affecting parts of the waters off the Atlantic Coast has been defined, but it would seem that so far as the coast of North Carolina is concerned no specific provision has been made and hence the question must be resolved under the provision of 33 C.F.R. § 82.2 that the general rules for inland waters shall be observed at all buoyed entrances from seaward to bays, sounds, rivers or other estuaries for which specific lines are not laid down, and that the waters inshore of a line parallel with the shore, drawn through the

outermost buoy, are inland waters to which the inland rules apply. A difference of opinion exists as to whether there are any such bays, sounds, rivers or estuaries in the neighborhood of the point of collision and in the absence of such waters it would seem that the international rules of navigation would apply. The question need not be decided, however, for, in the view which was taken by the District Judge, with which we concur, the liability of the Dewey is made out, whichever set of rules is applicable.

■■■■ It is contended that if the inland rules apply the Dixie B was required by Rule I to give a short blast of her whistle indicating a port-to-port passage, and if she was uncertain as to the intention of the other vessel she was required by Rule III to signify her doubt by giving several short and rapid blasts, not less than four, of the steam whistle; see 33 U.S.C.A. § 203; or, on the other hand, if the international rules apply, it is said that the Dixie B was required to maintain her course and speed under Rule 21, 33 U.S.C.A. § 146e, and if in doubt whether sufficient action was being taken by the other vessel to avoid collision, it was her duty to indicate the doubt by giving at least five short and rapid blasts on the whistle under Rule 28, 33 U.S.C.A. § 147(b). Since the Dixie B did none of these things, it is said that her contribution to the accident must be considered to have been established. The District Judge, however, took the position that the negligence of the Dewey was so glaring that the major and minor fault rule should be applied to the effect that where fault on the part of one vessel is established by uncontradicted evidence and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel, and any reasonable doubt with regard to the propriety of such other vessel should be resolved in its favor. See Theothilatos v. Martin Marine Transport Co., 4 Cir., 127 F.2d

1016. We think that this rule was properly applied in this case. It is established by the evidence that the navigators of the Dixie B had no inkling that the Dewey would attempt to cross over to the west side of the channel and endanger her own safety by running into shoal water but, on the other hand, had every reason to believe that she would head northward in the direction of the green flashing buoy. The action of the Dewey was so foolhardy and inexplicable that it could not have been anticipated. Moreover, it seems clear that the sounding of the whistle of the Dixie B would not have affected the Dewey's course since there was nobody in control of her navigation at that time. The requirements of The Pennsylvania rule must be strictly enforced for the safety of navigation, but it should not be pressed to such an extreme as to justify a division of damages when the accident was undoubtedly due to the negligence of an offending vessel whose actions could not be anticipated. See Oaksmith v. Garner, 9 Cir., 205 F.2d 262; National Bulk Carriers v. United States, 80 F.Supp. 188, affirmed, 2 Cir., 183 F.2d 405; cf. General Seafoods Corp. v. J. S. Packard D Co., 1 Cir., 120 F.2d 117.

■■■ The libellant filed a cross-assignment of error on the ground that the Court failed to find that his damage was $65,000 with interest from the date of collision. Estimates of the market value of the Dixie B varied from $60,000 to $65,000 according to witnesses offered by libellant, and from $25,000 to $35,000 according to witnesses produced by the respondent. She was constructed for use on northern fishing grounds and was of much heavier material than the shrimp boats used in the South. She had been burned out and rebuilt and again rebuilt and equipped with a new engine after a second accident in 1953, but was in fine condition at the time of the collision. The Judge found that she was a stronger vessel than was needed for the work she was doing and fixed a value of $40,000. After reviewing the evidence we do not

hold the conviction that this finding was mistaken, as we must in order to modify it. See McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

The judgment of the District Court will be affirmed.

Affirmed.