See also, D.C., 154 F.Supp. 515.

NICOLAS EUSTATHIOU & CO., Owner of THE Greek Steamship MICHAL-AKIS, Libellant,

v.

UNITED STATES of America, Owner of THE U.S.S. SHADWELL, (LSD 15), Respondent.

No. 7751.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 10, 1957.

Findings of Fact April 8, 1959.

Vandeventer, Black & Meredith, Hugh S. Meredith, Norfolk, Va., for libellant.

Harold G. Wilson, Trial Atty., U. S. Dept. of Justice, Washington, D. C., L. S. Parsons, Jr., U. S. Atty., and John M. Hollis, Asst. U. S. Atty., Norfolk, Va., for respondent.

### Findings of Fact and Conclusions of Law.

From the evidence adduced by the parties, and the arguments of counsel, the Court hereby finds the facts specially and states separately its conclusions of law thereon:

1. That the libellant, at all of the times hereinafter mentioned, was the owner of the Greek Steamship Michalakis.

2. That the Steamship Michalakis is a single screw, former American "Liberty" ship, powered by a 2,500 horse power steam reciprocating engine.

3. That the U.S.S. Shadwell (LSD 15) is a Naval vessel owned by the United States of America, called a "Landing Ship Dock", 457 feet in length, 70 feet in breadth, of 9,000 tons displacement powered by two steam engines with a total of 7,000 H.P., having twin screws and twin rudders, a flank speed of sixteen knots, and a deep draft at the times hereinafter mentioned of 17 to 18 feet.

4. That at about 2:00 a. m. on the morning of October 18, 1955, the Michalakis, laden with a cargo of 9,795 (long) tons of coal, and with a draft of 27′ 8″ forward and 28′ 8″ aft, departed from the Port of Hampton Roads, with A. C. Johnson, State Pilot, aboard. Michalakis turned on her navigational lights on getting underway and was exhibiting her red and green side lights, her two white masthead lights and her stern light.

5. Pilot Johnson took Michalakis down the Thimble Shoal Channel, steering a course of 105° T. On leaving this channel, course was altered to the left to approximately 090° T. in order to pass starboard to starboard another vessel which was inbound from Baltimore. At about this time the engine of Michalakis was reversed preparatory to the pilot leaving, and a three blast signal was given to indicate that Michalakis was going astern. The whistle of the Michalakis was found to be working satisfactorily at this time. After this inbound vessel had passed, at about 4:35 a. m., the engine of Michalakis was put on slow ahead and her helmsman was ordered to swing back to the right to 105° T., and she was coming to this course when the pilot was disembarked.

6. The tide at this time was ebbing with a set to the southeast to such an extent that Michalakis had been steering a course of 105° T. in order to make good the channel course of 108° T. as she came down the channel. The night was clear, the sea calm, the wind light and visibility was good.

7. Pilot Johnson left Michalakis at approximately 4:35 a. m. Michalakis time. At this time Michalakis was in an area estimated by the pilot to be about three-quarters of a mile to the southwestward of Buoy "2-A". The master and chief officer of Michalakis say that the quick flashing whistle buoy, marked on the chart as "A", was bearing ahead over the bow of Michalakis at this time, and that Michalakis was on a heading of about 90°-95° T. This would put her in a position somewhat to the southward of the position estimated by the pilot, and in all probability she was somewhere between these two estimated positions. At the time that the pilot was

taken off the mate of the pilot boat observed that the navigational lights of Michalakis were burning brightly.

8. After discharging her pilot Michalakis, with her master and chief officer on the bridge, continued changing course to the right until she had steadied on course 105° T., and her engine remained at slow ahead (approximately 3½ knots) until 4:40 a. m., when the telegraph was put on full ahead. At about this time the green side light and range lights of an approaching vessel (which turned out to be the Shadwell) were observed on the port bow at a distance estimated at about 2½ to 3 miles. Michalakis at this time was showing Shadwell her red side light, which the commanding officer of Shadwell describes as "perfectly normal and quite bright", and her two range lights, and the two vessels were on crossing courses. The Michalakis held her course of 105° T. and her telegraph remained on full ahead, her master expecting the Shadwell to alter her course to the right to pass under the stern of Michalakis. Those in charge of Michalakis continued to observe the Shadwell and noticed that neither her heading nor her bearing was changing, and when it became necessary that the Michalakis take some avoiding action, she sounded a one-blast signal and her rudder was put hard right. Those on Michalakis then heard a two-blast signal from Shadwell indicating that she was directing her course to port. Michalakis then gave another one-blast signal, followed immediately by full astern and three blasts to indicate that her engine was going full speed astern. Michalakis continued to turn to the right under the effect of her full right rudder and Shadwell continued on her same course at unabated speed, striking Michalakis on her port side in the way of No. 3 hold, inflicting substantial damages to both vessels. The collision occurred at 4:47 a. m. Michalakis time.

9. The engine room telegraph of Michalakis remained on full ahead from 4:40 a. m. until 4:45 a. m., when the telegraph was put full astern. Michalakis was fully loaded, and full speed in this condition would normally be about ten and one-half knots, but it takes some time to work up to this speed, and it is estimated that at the time that she went full astern she had worked up to about seven and one-half knots. It is, therefore, clear that the speed of Michalakis, during the five minute period before she reversed, was gradually increasing, although the engine room telegraph remained the same. It would have been readily apparent to Shadwell, however, if she had been keeping a proper lookout, that Michalakis had just dropped her pilot and could be expected to increase speed. In any event, Shadwell was in no way misled by this increase in speed as she did not see Michalakis until just before she reversed, and any gradual increase in speed prior to this time could not have contributed to the collision.

10. The only whistle signal from Michalakis that was heard on Shadwell was the first one blast which was heard on this vessel by Lt. (j. g.) Pinette, her navigator, and the signalman on watch, Busche. However, neither of these two persons made any report of this whistle signal to the commanding officer, or the officer of the deck, and there was no reliance on the meaning of this signal by those in charge of the navigation of the Shadwell. The fact that this signal was heard by Pinette and Busche is important, however, because it establishes the distance that the two vessels were apart at the time that Michalakis put her rudder hard right and departed from her course of 105° T. Both vessels agree that the two blast signal of Shadwell, followed the first one blast of Michalakis, and we have many estimates of the distance that the two vessels were apart at this time, since the two blast signal of Shadwell was given simultaneously with the order for left rudder, and almost immediately after the commanding officer of Shadwell first sighted the lights of Michalakis. Commander Friedrick estimated the distance between the two vessels at this time as being 1,000 yards; Lt. (j. g.) Wisda, the officer of the deck,

estimated it at 700–800 yards; and Pinette estimated it at 500 yards. It being apparent that the distance cannot be determined with any degree of accuracy, the Court finds that a fair estimate of this distance is between 500–1,000 yards.

12. The Michalakis was being steered on her course of 105° T. by an automatic steering device after the full ahead signal which was given at 4:40 a. m., until the rudder was put hard right at the time of the first one blast by Michalakis, but there is no evidence that this device was defective, or that the vessel was not held on a steady course up until it was taken off automatic and put hard right by the master at the time of the first one blast signal by Michalakis.

13. The Shadwell had come down the coast from New York and was inbound for the Naval Amphibious Base at Little Creek on the Southern Shore of Chesapeake Bay. She arrived off Chesapeake Lightship at 0347 hours (3:47 a. m.) and changed course to 265° T. which she intended to keep until she had reached the Thimble Shoal Channel course of 288° T. Lt. (j. g.) Wisda was the officer of the deck. As the Shadwell approached the entrance to Chesapeake Bay, Commander Friedrick, her commanding officer, was called and a few minutes after he had arived on the bridge he suddenly observed the lights of Michalakis on the starboard bow of Shadwell at a range of 1,000 yards. He was momentarily stunned, but managed to exclaim, "What the hell is that?", or words of similar import. The officer of the deck then ordered left 15° rudder and two blasts were sounded on Shadwell's whistle, although it was apparent to Commander Friedrick from the lights that Michalakis was showing that she was a vessel on a crossing course. Commander Friedrick at this point realized that Wisda did not have the situation under control, so he ordered the man at the wheel to shift the rudder to right 15°. He then changed his mind and ordered the rudder back to the left—to left full rudder—as the result of which the course of the vessel was not changed appreciably in either direction. Commander Friedrick's reasons for taking over the conn from Mr. Wisda are very aptly covered in his testimony:

"* * * it took me the time until he put the left 15 degrees rudder on her and then I realized that he didn't have the situation under control and I shifted the rudder, knowing that we should go astern of her. I have felt that had I for some reason or other had the conn, there would have been no delay there. I would have realized what the situation was. But I waited long enough to get the wrong rudder on. It just took me that period to realize that he didn't have it. It was loo late then."

While all this was going on, Shadwell continued her approach at flank speed, her highest sustained speed, which is ordinarily 16 knots, but estimated on this occasion at approximately 13½ knots over the ground, and it was not until the range to Michalakis had closed to 300 yards that Mr. Wisda gave any order to the engine room; he then ordered "all engines back one-third", which Commander Friedrick immediately followed with "all back full" and then "all back emergency". A few moments after these orders were received in the engine room, and before there was any appreciable reduction in the speed of Shadwell through the water, the collision occurred. According to the deck log of Shadwell the collision occurred at 0449, Shadwell time.

14. There is about a half mile or more between the estimated positions of the two vessels at the time of collision, as related by the witnesses from the two vessels, and in all probability the plot of the Shadwell which was kept by her full time navigator was more accurate than the plot made by the master of Michalakis during the course of his deposition. No fix was taken by either vessel at the time of collision, however, and little is to be gained from an examination of the fixes which were taken by

Shadwell after the collision, as she was maneuvering at this time. It is not necessary, however, for the Court to make a specific finding as to where the collision occurred, since it has been stipulated that it occurred in inland waters.

15. The tactical data on board the Shadwell and the admissions of her commanding officer and her navigator show that the collision could have been avoided had Shadwell gone full astern at the time that her commanding officer first sighted Michalakis and took her to be a vessel headed across his bow, showing her red side light. In fact, her navigator made this suggestion shortly after Michalakis was sighted when he shouted "back down full", but his advice went unheeded.

16. The tactical data on board the Shadwell and the admissions of her navigator and her commanding officer show that the collision could have been avoided had the rudder of Shadwell been put hard right at the time that her commanding officer first sighted Michalakis and took her to be a vessel headed across his bow and, in fact, this was the spontaneous reaction of her navigator when, on sighting Michalakis, he sang out, "Give her hard right rudder", but since he did not have the conn, this order was disregarded.

17. It is contended by the Government that since Michalakis did not have a seaman stationed on lookout watch, that this constituted a fault on her part. Conditions of visibility were excellent, however, and both the master and chief officer of Michalakis had the Shadwell in view constantly from 4:40 a.m. until the collision. In fact, the master of Michalakis had actually sighted Shadwell before this time, but Shadwell was too far away to give him any concern. If there had been a lookout stationed as such, he would probably have done nothing more than to report the lights of the Shadwell to those on the bridge of Michalakis and thereafter it would have been the duty of those on the bridge to keep track of it, and this is what they were doing. The Court, therefore, finds that there was no failure to keep a proper lookout on the part of Michalakis and, even assuming that a seaman had been stationed on a lookout watch, the Court finds that the collision would nevertheless have occurred.

18. The Michalakis says that Shadwell was first sighted bearing 35° to 40° on the port bow and the Government argues that this could not be true because if Michalakis was on a course of 105° T., and Shadwell was on a course of 265° T., and Shadwell was bearing 35° to 40° on the port bow of Michalakis, that the green light of Shadwell would not have been visible to Michalakis. Shadwell, on the other hand, says that Michalakis was bearing about 5° on her starboard bow at the time she was first observed by Shadwell. When these courses and bearings are plotted, it is apparent that either one, or both, of these bearing estimates are in error (no instrument bearings were taken by either vessel) and in all probability the bearing of Shadwell from Michalakis was closer to 20° than 35° to 40°, and that of Michalakis from Shadwell was probably greater than 5°. In fact, either of the vessels could have been off course a few degrees and this would also have affected their relative bearing from each other. Whether the bearing was 20° or less, however, is of no importance as there was still 20° between the courses of the two vessels and Michalakis was showing Shadwell her red light and Shadwell was showing Michalakis her green light. These are undisputed facts, and they show clearly that the two vessels were on crossing courses, and that Michalakis was the privileged vessel. In fact, this is admitted by the commanding officer and navigator of Shadwell.

## Conclusions of Law.

On these facts the Court reaches the following conclusions of law:

(a) As the two vessels approached each other a crossing situation existed and under Article 19 of the Inland Rules (33 U.S.C.A. § 204) there was a duty on the part of Shadwell to keep out

of the way of Michalakis, and Shadwell is at fault for failure to take any effective avoiding action. In Hellenic Lines v. The Exmouth, 2 Cir., 253 F.2d 473, 475, 1958 A.M.C. 1018, certiorari denied American Export Lines, Inc. v. Hellenic Lines, 356 U.S. 957, 78 S.Ct. 1006, 2 L. Ed.2d 1074, the court had before it an almost identical set of facts, even to the whistle signals exchanged and the confusion which existed on the bridge of the giving-way vessel:

"After Hellenic was sighted by Exmouth there was considerable confusion on Exmouth's bridge. Being the burdened vessel it was Exmouth's duty to keep clear of Hellenic. Had Exmouth veered to the right in a northerly direction a port-to-port passing could have been effected. This should have been normal procedure regardless of the presence of Hellenic because the pilot boat and Exmouth's ultimate destination were toward the north. Continuation of a due westerly course would have caused Exmouth to run ashore in a very short time. The Captain of the Exmouth, however, gave the command to come to the left. The helmsman said, 'you mean right, Captain' and immediately the third mate added 'Yes, that's right, you will have to come to the right.' The Captain, nevertheless, persisted by saying 'Hard left' and the helmsman obeyed these orders. If Exmouth had turned to the right at the time the Hellenic was observed, the collision could undoubtedly have been avoided. Finally, when the vessels were but a short distance apart the Exmouth Captain ordered the helmsman to come to the right but too late to avoid collision."

And in holding the Exmouth solely to blame, the Court stated:

"Under ordinary circumstances Hellenic, as the privileged vessel, was entitled to maintain her course and speed. If Hellenic had to speculate that Exmouth would not obey the rules and engage in avoiding action on that assumption, the rules might as well be discarded. Navigation would be reduced to a game of bluff. Wilson v. Pacific Mail S.S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771; National Bulk Carriers v. United States, 2 Cir., 1950, 183 F.2d 405; Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 1949, 175 F.2d 632. Exmouth's duty was well defined in The Nereus, D.C.S.D.N.Y.1885, 23 F. 448, 455, the court saying: 'A steamer bound to keep out of the way of another steamer by going to the right, * * * has no right, when under no stress of circumstances, but merely for her own convenience, to give the other steamer a signal of two whistles, importing that she will go to the left, unless she can do so safely by her own navigation, without aid from the other, and without requiring the other steamer to change her course or her speed. Otherwise she would be imposing upon the latter steamer more or less of the burden and the duty of keeping out of the way, which by statute is imposed on herself.'

"This does not mean that the last clear chance rule strongly advanced by Exmouth is to be ignored. Its application, however, depends upon the facts. Here Exmouth had ample room and time in which to maneuver to avoid the collision. Hellenic had every reason to believe that Exmouth would keep clear. Only when Hellenic heard Exmouth's two blasts was there any indication to the contrary. Even then it was Hellenic which reversed at full speed. Exmouth did nothing to avoid a collision although its two blasts showed consciousness of danger. Upon the facts the last clear chance rule cannot be availed of by Exmouth to create a mutual liability situation."

(b) Being the giving-way vessel in **a** crossing situation, there was a duty on the part of Shadwell under Article 22 of the Inland Rules (33 U.S.C.A. § 207) to avoid crossing ahead of Michalakis, and Shadwell was at fault in failing to make any effective alteration of course, which was tantamount to an effort to cross ahead of Michalakis.

■ (c) There being a duty on the part of Shadwell to keep out of the way of Michalakis it was encumbent upon Shadwell under Article 23 of the Inland Rules (33 U.S.C.A. § 208) to "slacken her speed or stop or reverse" and Shadwell was at fault in failing to reverse its engines until the distance between the two vessels had closed to 300 yards.

■ (d) That Shadwell was at fault in not having sighted Michalakis before the range between the two vessels had closed to 1,000 yards or less, and this constitutes a failure to keep a proper lookout as required by Article 28 of the Inland Rules (33 U.S.C.A. § 293).

■ (e) The Shadwell was at fault in approaching this busy intersection off Cape Henry at flank speed, when it was known, or should have been known, that both inbound and outbound vessels would be encountered from many different directions, and that these vessels would be maneuvering to pick up, or discharge their pilots. Such a situation was fraught with danger and required the careful navigation of an experienced mariner.

■ (f) It is contended that Michalakis failed to hold her course and speed because her speed was gradually increasing under the full ahead bell which she gave at 4:40 a. m. She was not sighted by Shadwell, however, until three minutes before the collision and one minute before Michalakis reversed her engine. The purpose of the rule requiring the privileged vessel to hold course and speed is to enable the burdened vessel to navigate with assurance as to the action of the other, and implicit in this is the fact that the burdened vessel senses that the other is privileged and there is reliance on that, and in expectation that the other will hold course and speed, adapts her navigation to the rules. Bloomfield Steamship Co. v. Brownsville Shrimp Exchange, 5 Cir., 243 F.2d 869, 1957 A.M.C. 1247. It is therefore clear that the gradually increasing speed of Michalakis could not have contributed to the collision. Furthermore, the duty to hold course and speed under Article 21 of the Inland Rules (33 U.S.C.A. § 206) requires that the privileged vessel hold course and speed in following the nautical maneuver in which, to the knowledge of the other vessel, she is at the time engaged. Here it would have been clearly apparent to Shadwell, had she been keeping a proper lookout, that Michalakis had just discharged her pilot and was making her departure for sea.

■ (g) It is contended that Michalakis should have held her course longer than she did, and should have gone astern sooner, but the authorities are clear that under such circumstances the holding-on vessel is entitled to considerable latitude in making her decision and will not be held at fault for a mere error of judgment forced upon her by the fault of the giving-way vessel. Wilson v. Pacific Mail S.S. Co., 276 U.S. 454, 461, 48 S.Ct. 369, 72 L.Ed. 651, 1928 A.M.C. 740, 742. See also, Griffin on Collision, Section 51(4), p. 153, and authorities cited.

■ (h) It is further contended that Michalakis should have blown the danger signal at the time that she sounded her first one-blast because her master says that he "began to become concerned" when he saw that Shadwell "wasn't turning". This same contention was rejected in the Compania De Navegacion Cebaco, S. A. v. The Steel Flyer (The Domina, The Steel Flyer), 4 Cir., 200 F.2d 643, 647, 1953 A.M.C. 95, wherein Judge Soper stated:

"It is contended that the Domina's pilot was in doubt as to the proper action to take, because he testified in chief that when he was

emerging from the bridge channel he took the precaution to blow his whistle and take a look at his red light because he did not like the way the Steel Flyer was approaching; and that his doubt was further shown by his testimony on cross examination when his attention was called to the signals above described and the maintenance by each vessel of her course and speed, and he was asked at the end of the questioning whether these circumstances made him at all curious about the navigation of the Steel Flyer and he replied, 'I was wondering a bit.'

"In our judgment these answers by the pilot indicated the necessary interest and concern which every experienced and cautious navigator must feel when the ship in his charge is approached by another, rather than a doubt that the Steel Flyer would obey the rules of the road."

See also Hellenic Lines v. The Exmouth, supra, wherein the holding-on vessel was excused from sounding the danger signal although an opposite conclusion had been reached by the District Court (134 F. Supp. 546).

 (i) It is conceded that both vessels were in Inland Waters, near the boundary between Inland and International Waters, although the master of the Michalakis may have thought that he was in International Waters since he had dropped his pilot at a location selected by the pilot. The only difference, however, between the Pilot Rules (applicable in Inland Waters) and the International Rules, insofar as this case is concerned, is in the meaning of the one-blast signal sounded by Michalakis. Under § 312.03 of the Pilot Rules, one short blast when given by the holding-on vessel in a crossing situation signifies that the vessel sounding it is going to hold her course and speed. Under the International Rules (art. 28, 33 U.S.C.A. § 147) it indicates that the vessel sounding it is directing her course to starboard. In the instant case, however, the one blast signal which was sounded by Michalakis was not heard by, or reported to, either the officer of the deck or the commanding officer of Shadwell, and the commanding officer of this vessel has freely admitted that he was in no way misled by it. It is, therefore, clear that the one blast signal of Michalakis, which was given in compliance with the International Rules, could not have contributed to the collision.

 (j) The Government charges Michalakis with failure to keep a proper lookout. The master and chief mate of Michalakis had the Shadwell in view at all times, after 4:40 a. m., however, seven minutes before the collision, and under such circumstances, the fact that no seaman was stationed on lookout watch could not have contributed to the collision. The Blue Jacket, 144 U.S. 371, 390, 12 S.Ct. 711, 36 L.Ed. 469; The Sea Gull, 23 Wall. 165, 176, 90 U.S. 165, 176, 23 L.Ed. 90.

 (k) The collision was solely and proximately caused by the faults and negligence of the Shadwell enumerated above. There was no reason for those in charge of Michalakis to anticipate the admitted major faults committed by Shadwell, and if there was any doubt in the matter, Michalakis should be relieved under the major and minor fault rule to the effect that where one of two vessels is so grossly at fault as to account for the collision, doubt as to the propriety of the navigation of the other vessel should be resolved in her favor. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Domina, The Steel Flyer, supra; Webb v. Davis (The Dixie B., The Dewey), 4 Cir., 236 F.2d 90, 1956 A.M.C. 1789, 1792.

An interlocutory decree fixing liability as above determined will be entered upon presentation.