**PACO TANKERS, Inc. v. THE RODAS.**

**N/V CURACAOSCHE SHEEPVAART**

**MAATSCHAPPIJ v. THE CHAS KURZ et al.**

Nos. 133–308, 138–221.

United States District Court
S. D. New York.

Sept. 29, 1948.

Kirlin, Campbell, Hickox & Keating, of New York City (Raymond T. Greene, Eugene F. Gilligan and Ira A. Campbell, all of New York City, of counsel), for libelant and cross-respondent.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark, A. Howard Neely and Charles E. Wythe, all of New York City, of counsel), for The Rodas.

RIFKIND, District Judge.

These cross libels arose out of a collision between S. S. Charles Kurz and S. S. Rodas in the sea off Puerto la Cruz, Venezuela, at 1:45 a. m. on November 7, 1942.

It was a clear, dark, moonless, tropical night. The sea was unruffled. Both the Charles Kurz and the Rodas had, on November 6th, taken on cargoes of oil and at midnight had received their signals to take their places in an eight ship convoy, escorted by a Dutch man-of-war, the Queen Wilhelmina, and commodored by the armed Rebecca.

The convoy was to be formed of three columns abreast, two ships in the port column, three ships in the center column, and three ships in the starboard column. Rebecca was first ship, starboard column; Charles Kurz was third ship, starboard column. Rodas was second ship, center column; La Salina was third ship, center column.

At about the time of the collision, the convoy was moving toward the first rendezvous and had not yet formed into the established convoy pattern. Particularly, its lateral intervals were not yet up to full size. The general direction of the movement was a little to the west of north, or about 350°.

Both masters of the Charles Kurz and of the Rodas knew that they were in an area very dangerously infested with submarines. They were under instructions to show no lights. Both were masters of long experience. Both had previously sailed in convoys; but neither had ever formed a convoy at night. On the trial, the testimony of the engineer of the Charles Kurz was received orally. All of the rest

of the evidence was by deposition. The evidence consisted, on behalf of the Charles Kurz, of the depositions of the master, second officer and look-out of the Charles Kurz and the master and second officer of the La Salina. On behalf of the Rodas, the testimony consisted of the depositions of the master and watch officer.

According to the testimony offered on behalf of the Charles Kurz, the events, as observed before the collision, were these: first, the Rodas was observed maneuvering somewhere to port of the center column. Directly thereafter and at 1:43 a. m. the Rodas changed course to starboard, crossed the bow of the La Salina, and bore down at right angles to the course of the starboard column. Immediately the Charles Kurz put her engines full speed astern. The Rodas crossed the bow of the Charles Kurz and the two vessels came into collision, the bow of the Kurz striking the starboard side of the Rodas forward of the bridge and penetrating ballast tank No. 4 and into the main tank, at an angle of about 70°.

For the Rodas it was testified that her officers knew what position she was to occupy in the convoy although the master had not attended the convoy conference. He had not been invited to any such conference. While proceeding in a generally northerly direction during the convoy formation, he recognized the Rebecca, of which he had once been master. He knew the Rebecca was armed. He decided that the most desirable and safest position for him to occupy was directly astern of the Rebecca. He, therefore, set a course across the general direction of the convoy in order to maneuver into the coveted position. The Rebecca passed the Rodas from starboard to port. Thereupon he put his rudder hard left and his port engine full astern in order to fall behind the Rebecca. Those on the Rodas never saw the Charles Kurz until she was less than ship's length away and collision was inevitable.

The faults of the Rodas are too egregious to require elaboration. Her master knew he was assigned to position number 22, but reckless of his comrades in the convoy he decided that he preferred the protected position astern of the commodore and, in order to reach that position, he set out on an independent course across the route of seven other ships, all travelling without the aid of lights, and selfishly shouldered his way around. Considering the inherently dangerous maneuvers that the Rodas was engaged in, one would suppose that at least her lookouts would be every where and alert to every possible source of danger. In fact she had no lookout at all on the forecastle head and the one on the bridge was in the port wing. One would suppose that a vessel bent on such a purpose would adjust her speed to the perils of her enterprise. Not so the Rodas. The testimony is uncontradicted that, after making her right angle turn to move from column two to column three, she proceeded at a trifle under full speed or between seven and nine knots.

It is suggested that the Rodas failed sooner to observe the Charles Kurz because a dark range of mountains in the background served to conceal her. I do not credit the explanation. The same range of mountains failed to conceal the Rebecca from the view of the Rodas' officers while traversing the same seaway. With her faults so plainly made out, it is not surprising that the Rodas should search the conduct of the Charles Kurz in an effort to find some flaw which would mitigate her own liability. I shall treat these seriatim. First, it is claimed that the Charles Kurz failed to keep a good lookout. The evidence shows that the lookout was properly posted on the forecastle head. He observed the Rodas when, according to his estimate, she was five hundred yards distant. He did not report to the bridge. Instead, he ran aft to awaken the crew, as he apprehended an explosion. Before he had taken many steps, he first heard the ship's telegraph and then felt the vibration of the ship's engines in reverse. Now much is made of the fact that the master's estimate was that the Rodas was two hundred yards away when he first observed her as likely to embarrass his navigation. It is suggested that had the lookout reported when the Rodas was five hundred yards distant the collision could have been avoided. It seems to me, however, that too much reliance can-

not be placed upon the estimate of distance on a dark night with blacked out vessels. It is uncontradicted that the Charles Kurz' engines were in reverse for two minutes before collision. A calculation of the probable distance between the two vessels at a point in time two minutes before the collision figures out at about five hundred yards. So long as the Rodas was in column two she was of no concern to the Charles Kurz. The ringing of the ship's telegraph would indicate that the bridge and lookout observed the Rodas at about the same time. The few seconds difference could not have avoided the collision, considering that the Rodas was struck forward of the bridge. The Kurz, therefore, has sustained the burden of showing that the lookout's breach of duty could not have contributed to the collision. The Madison, 2 Cir., 1918, 250 F. 850; The Ariadne, 1871, 13 Wall. 475, 20 L.Ed. 542; Panama Transport Co. v. The Maravi, 2 Cir., 1948, 165 F.2d 719.

Apparently, the Rodas had some difficulty when she first maneuvered into position 22, that is, the second vessel in the center column. The master of the Kurz testified that at 1:40 he observed on his port two black blobs too close to each other for comfort. The second mate also heard a four blast signal. The Rodas argues that the Kurz should then have stopped and reversed, but no persuasive reason has been given to support such a suggestion. The Kurz was moving at a moderate rate alternating between two and five knots. It knew it was a member of a convoy with a column on its port. Crowding in the first or second column was not likely to interfere with its navigation in the third column. It seems unreasonable to attribute to the Kurz such premonition that a second column vessel should suddenly decide to cut across the convoy on a 90° turn.

The Rodas complains of the failure of the Kurz to switch on lights. It is to be noted that the Rodas likewise remained dark. The master of the Kurz testified to the very firm instructions against lights which he had received at the convoy conference. Nevertheless, the courts have generally insisted that, regardless of the submarine danger, lights must be displayed during collision avoiding maneuvers. The Cushing, D.C.S.D.N.Y.1920, 266 F. 570, affirmed 2 Cir., 292 F. 560.

Cf. The Maravi, D.C.S.D.N.Y.1946, 70 F.Supp. 817, affirmed Panama Transport Co. v. The Maravi, 2 Cir., 165 F.2d 719.

I am not persuaded by anything in the testimony that the failure to switch on lights contributed to the collision. The whole story developed inside of two minutes. Moreover, proctors for the Rodas themselves say in their brief, "It is reasonable to assume that the Rodas should be giving all of her attention to extricating herself from the immediate peril of collision with the Rebecca before turning her attention to other vessels in the vicinity".

That peril, too, was of the Rodas' own making. The master of the Charles Kurz misjudged the emergency created by the Rodas. This seems to me to be a case covered by the doctrine of the City of New York, Alexandre v. Machan, 1893, 147 U. S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, to the effect that, "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel".

Paco Tankers, Inc., as owner of the Charles Kurz, is entitled to a decree for her damages and the libel of the owners of the Rodas is dismissed.