Kenneth DANIELS, Plaintiff,

v.

TRAWLER SEA-RAMBLER, her engines, tackle, apparel, etc., in rem, and W. G. Saunders and John R. Lawson, as owners, in personam, Defendants.

Civ. A. No. 6426.

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 19, 1968.

Robert M. Hughes, III, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for plaintiff.

R. Arthur Jett, Jr., Jett, Sykes & Berkley, Norfolk, Va., for defendants.

## MEMORANDUM ORDER

KELLAM, District Judge.

Plaintiff, the owner of the Trawler HI-WAL, filed this action against the Trawler SEA-RAMBLER, and her owners, to recover damages in the amount of $40,000.00, alleged to have been sustained when the HI-WAL sank as a result

of a collision between it and the SEA-RAMBLER, due to the alleged fault of defendants. Defendants answered and filed a counterclaim seeking $25,000.00 damages to the SEA-RAMBLER as a result of the collision aforesaid. Plaintiff answered the counterclaim and filed a plea of limitation of liability.

The two trawlers in question were returning to Norfolk from fishing operations in the New England waters. They were proceeding in the Atlantic Ocean along the East Coast line. The trawlers had been en route two days. Each trawler is about 110 feet long, with a beam of about 16 feet, propelled by caterpillar diesel engines. The wheelhouse on each was about midship. Each was a former Coast Guard sub-chaser, and carried a crew of three, who took turns in standing watch. W. G. Saunders was captain of the SEA-RAMBLER and his son, W. G. Saunders, Jr., was captain of the HI-WAL. As the trawlers left Newport Rhode Island, the SEA-RAMBLER fell in behind the HI-WAL because the SEA-RAMBLER was faster, the HI-WAL had had trouble with taking on water from leaking, the vessels wanted to stay together, and the HI-WAL had an automatic pilot. They proceeded down the coast at a rate of speed of about six miles per hour.

On the morning of October 21, 1967, at about 10:30 a. m., the trawlers had reached a point about 18 miles south of Ocean City, and 7 or 8 miles off the coast. Visibility was good, the sea a little rough with winds southwest (the direction in which they were headed) at between 25 to 30 miles per hour. The trawlers were proceeding with HI-WAL in the lead, SEA-RAMBLER about three boat lengths behind and about three boat lengths to the left (port). This was described as a proper formation for such trawlers. The captain of each trawler was on duty. Captain Saunders was at the wheel of the SEA-RAMBLER and his son on the HI-WAL. The controls, compass and whistle of each boat were in easy reach of the person conning the trawlers. The captains had just been in

radio communication with each other. Each boat would vary its course by reason of the wave and wind action. Captain Saunders of the SEA-RAMBLER was standing at the wheel steering, watching the HI-WAL. He noticed the HI-WAL in a part turn to port, but presumed she would go back on course as she "always did." When he realized she was in fact turning and not going back on course, he turned the SEA-RAMBLER hard to starboard. He did not then reduce speed as he was running against the sea and needed the power to turn. When he realized he was not going to clear the HI-WAL, he put engines astern. He was then 50 to 100 feet from the HI-WAL. It was necessary to slow the engines before he could put them astern. This is done by air control, "Mash a button and wait for her to go in neutral and then mash the other button to go astern," then speed up the engines. When the engines were "full astern he was 25 to 50 feet from the HI-WAL. He struck the HI-WAL about 6 to 8 feet from the back end. No signal was given by the HI-WAL of the intended turn or the reason for it. At the time of striking the HI-WAL was in about a 90 degree turn, and was still swinging at the time of the impact. The HI-WAL "started taking on water fast." It sank in a few minutes. The SEA-RAMBLER picked up the three members of the crew and the Coast Guard was immediately notified.

Immediately before the collision Captain W. G. Saunders, Jr. was at the controls of the HI-WAL. It was operating on automatic pilot, "and all of a sudden the HI-WAL started turning to the left." "I figured * * * the boy had told me before that she had flew out of gear with him, you know, automatic pilot * * * I figured the same thing happened. And I jumped down there to turn the wheel to the right and re-engage the automatic pilot. When I started turning her to the right she didn't respond and by that time slam bang."

Three or four times before the accident on the trip down, "it would jump out of

gear and go from automatic to manual." This would require the operator to bring the trawler back on course manually and re-engage the automatic pilot. It had happened before on the run down the coast with Captain Saunders, and at that time it took him two to three minutes to get her back on course.

Kenneth Daniels testified that he was familiar with the automatic pilot. He had had trouble with it while he was on board. It had jumped out of gear with him. When it jumped out of gear the HI-WAL had a tendency to turn to port. He had repaired it and replaced parts. A month before the collision in question he had work done on it. Wilson Wescott, one of the crew of the HI-WAL, testified he had trouble with the automatic pilot— with it jumping out of gear, and that in June and July of 1967, when Captain Saunders took over as captain, there was trouble with the automatic pilot; and at the end of the summer after it was serviced, they still had trouble with it jumping out of gear. Sometimes it would lock and you would have to "kick her out of gear." Captain Saunders of the SEA-RAMBLER did not have knowledge of any difficulty with the automatic pilot, until after the collision.

Plaintiff has conceded its fault and "that the collision resulted in part from the fault of the Trawler HI-WAL," but says SEA-RAMBLER was also at fault and negligent in—

(1) Failing to maintain any or a proper lookout;

(2) Failing to sound whistle signals;

(3) Following too close on HI-WAL.

Since fault on the part of HI-WAL is admitted, we need only concern ourselves with whether the SEA-RAMBLER was jointly at fault, and if not, whether plaintiff is entitled to invoke the limitation of liability benefits provided by 46 U.S.C. §§ 183–189. Each of the above matters will be dealt with separately.

## LOOKOUT

■ At the time of the collision the master of the SEA-RAMBLER was in the wheelhouse conning the vessel. He was an experienced captain, and had been going to sea for 40 years, having served as master 25 to 30 years. At the time of the collision, his vessel was "handling perfectly," he had a good view, and could see the HI-WAL clearly. He was at the wheel "steering and of course watching him." He observed the HI-WAL in a part turn but presumed she would "come back on course" as she previously did. When he realized she was not going back on the course, he rolled his wheel to starboard to try to clear him. When he first observed the HI-WAL in a turn, she was 20 to 30 degrees from her course. The SEA-RAMBLER was then 2 to 2½ boat lengths away. There is not the slightest bit of evidence the master of the SEA-RAMBLER did not see the HI-WAL when she started her turn. Each boat would vary its course by wave and wind action. An additional lookout could not have seen anything more than the master saw. Since the wave and wind action varied the course of each boat, if some other person had been on the bow as a lookout, he would have only seen what the master saw. He would not have known there was difficulty with the steering of the HI-WAL, or that when she started the turn, that she was not going to quickly return to the course. What was said by Judge Bryan in the case of Osaka Shosen Kaisha, etc. v. Angelos, Leitch & Co., etc., 301 F.2d 59, 61 (4th Cir. 1962) is particularly applicable here:

> Moreover, beyond dispute the navigating officers of Atlas held Elene in eye constantly from the time Atlas was at Fort Carroll, some half hour before collision. All that was fairly observable, they observed. A crewman solely devoted to lookout could not have accomplished more. Neither deck officers nor crew could anticipate irresponsible straying by Elene. Nothing foreshadowed her threat. Even reacting immediately, the tug had barely enough time or space to clear. Atlas surely had no opportunity to escape the jaws of the impending disaster

born of Elene's wantonness. Even if a specially assigned lookout was obligatory, the evidence is "clear and convincing", we think, that his absence was not a contributing cause of the collision. Anthony v. International Paper Co., 289 F.2d 574 (4th Cir. 1961). That there was diligence of lookout is confirmed by the State pilot's detection of the menace of Elene at almost the same time as that of the tug deckhand, who was even nearer to her and in more imminent peril, " * * * [T]he question of the sufficiency of the lookout in any instance is one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation". Judge Soper in Anthony v. International Paper Co., supra 289 F.2d at 580.

Again, in Anthony v. International Paper Company, 289 F.2d 574, 580 (4th Cir. 1961), Judge Soper in speaking of the question of necessity of a lookout in addition to the person conning the vessel, and to decisions requiring such a lookout, said:

Examination of these decisions, however, reveals that these rules have been laid down with respect to vessels of considerable size whose navigators are usually occupied with the performance of various other exacting duties, and so it is generally held that an arbitrary rule cannot be applied to every case and that the question of the sufficiency of the lookout in any instance is one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation. Thus in Bradshaw v. The Virginia, 4 Cir., 176 F.2d 526, 529, and in The Pocomoke, D.C.E.D.Va., 150 F. 193, 197, it is indicated that the size of the vessel and the opportunity of the navigator to have a full view of the sea should be taken into consideration in determining the need for a separate and independent lookout. See also the

decisions in the First and Fifth Circuits in Stevens v. United States Lines, 1 Cir., 187 F.2d 670; Zigler Co. v. Barker Barge Line, 5 Cir., 167 F.2d 676; Smith v. Bacon, 5 Cir., 194 F.2d 203; Parker Bros. & Co. v. DeForest, 5 Cir., 221 F.2d 377.

In Luckenbach S. S. Co., Inc. v. United States, 9 F.2d 804, 806 (2d Cir. 1926), the Court speaking through Judge Manton, said:

Assuming that the Lake Delancey was navigating too near the Pleiades—which is the chief fault charged against her—there is no evidence that she intended to pass. She gave no signals of such intention. Still the collision would not have occurred, but for the difficulty which the Pleiades was having in her navigation, because of the sudden and unexpected sheer she took. The collision would have been avoided, but for that sheer. The Portia, 64 F. 811, 12 C.C.A. 427. If it were negligent for the Lake Delancey to follow so closely, that is an antecedent act of negligence, because it would not have resulted in collision, had the Pleiades not taken the sheer. The sheer sufficiently accounts for the collision. The M. J. Rudolph (C.C.A.) 292 F. 740.

The law does not impose upon an overtaking vessel the obligation of anticipating improper navigation on the part of the other vessel. Long Island R. R. Co. v. Killien, 67 F. 365, 14 C.C.A. 418.

See also United States v. S. S. Soya Atlantic, 330 F.2d 732, 735 (4th Cir. 1964); Bloomfield Steamship Co. v. Brownsville Shrimp Exchange, 243 F.2d 869, 872 (5th Cir. 1957); Rice v. United States, 168 F.2d 219, 220 (2d Cir. 1948).

Under the facts and circumstances of this case, I am convinced the failure to station a person as lookout, in addition to the master, was not a proximate contributing cause of the collision.

### FAILURE TO SOUND WHISTLE

Each vessel was equipped with a whistle, which could be sounded by the

person conning the vessel, without difficulty. When the HI-WAL's automatic pilot jumped out of gear, and the captain learned the vessel could not be controlled by manual operation, and that the vessel was turning to port, he did not sound a whistle. After the master of the SEA-RAMBLER observed the HI-WAL turning to port, and realized she was not going back on course, he did not sound his whistle. Plaintiff says this was negligence on the part of SEA-RAMBLER. The master says he was busy with trying to bring his vessel to starboard to clear the HI-WAL, and to reverse his engines. The giving of a signal by the SEA-RAMBLER saying to the HI-WAL, "You are changing your course, and such endangers me," would have meant nothing. The HI-WAL was out of control. It knew it was changing its course and it knew the position of the SEA-RAM-BLER. SEA-RAMBLER knew the same. What possible purpose would a signal serve? The effect of the failure to give a signal under such circumstances was answered in Webb v. Davis, 236 F.2d 90, 93 (4th Cir. 1956), where the Court said:

> Since the Dixie B did none of these things, it is said that her contribution to the accident must be considered to have been established. The District Judge, however, took the position that the negligence of the Dewey was so glaring that the major and minor fault rule should be applied to the effect that where fault on the part of one vessel is established by uncontradicted evidence and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel, and any reasonable doubt with regard to the propriety of such other vessel should be resolved in its favor. See Theothilatos v. Martin Marine Transport Co., 4 Cir., 127 F.2d 1016. We think that this rule was properly applied in this case. It is established by the evidence that the navigators of the Dixie B had no inkling that the Dewey would attempt to cross over to the west side of the

channel and endanger her own safety by running into shoal water but, on the other hand, had every reason to believe that she would head northward in the direction of the green flashing buoy. The action of the Dewey was so foolhardy and inexplicable that it could not have been anticipated. Moreover, it seems clear that the sounding of the whistle of the Dixie B would not have affected the Dewey's course since there was nobody in control of her navigation at that time. The requirements of The Pennsylvania rule must be strictly enforced for the safety of navigation, but it should not be pressed to such an extreme as to justify a division of damages when the accident was undoubtedly due to the negligence of an offending vessel whose actions could not be anticipated. See Oaksmith v. Garner, 9 Cir., 205 F.2d 262, 14 Alaska 309; National Bulk Carriers v. United States, D.C., 80 F.Supp. 188, affirmed, 2 Cir., 183 F.2d 405; cf. General Seafoods Corp. v. J. S. Packard D Co., 1 Cir., 120 F.2d 117.

See also opinion of Chief Judge Hoffman of this Court in Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697, 703 (D.C.Va.1960), affirmed Gratsos v. The Moisie Bay, 287 F.2d 706 (4th Cir. 1961), where he said:

> If the signal had been given under Inland Rules, the Audrey would have been advised of nothing other than the fact that the Moisie Bay intended to hold course and speed in the maneuver it was undertaking in approaching the Pilot Station, all of which has been heretofore discussed.

The failure to give a signal, even if required, was not a proximate contributing cause of the collision and did not constitute fault on the defendants.

### FOLLOWING TOO CLOSELY

As has been pointed out, the SEA-RAMBLER was not following directly behind the HI-WAL, but was off to the port some three ship lengths (over 300 feet) and about the same distance to the rear. The reasons for following the HI-

WAL have already been given—the boats wanted to stay together as the HI-WAL was having trouble taking on water, the SEA-RAMBLER was faster, the HI-WAL had automatic pilot, etc.

Plaintiff contends such following constituted negligence—because it would take four boat lengths to stop the SEA-RAMBLER. However, it must be kept in mind it would require about the same distance to stop the HI-WAL and SEA-RAMBLER would have the three boat lengths, plus the stopping distance of the HI-WAL, within which to stop. SEA-RAMBLER was not required to anticipate HI-WAL could stop as if it hit an immovable object, but if it did, the SEA-RAMBLER was safe off to the port. It was not required to anticipate that HI-WAL would, under the circumstances, attempt to stop or change course without signal. The Court has been cited no rule, regulation or court decision fixing or suggesting a proper interval between the lead and following vessel. It is a matter of reasonable care.

The mere fact that a collision occurred does not establish fault. When SEA-RAMBLER observed HI-WAL turning to port and realized she was not going back on course, a sudden emergency arose. The master was confronted with turning to port, or turning to starboard in an effort to avoid collision. It may be he did not make the wisest choice, and if he had turned to port he may have avoided collision. No one will ever know. HI-WAL was turning in a circle. She was out of control. SEA-RAMBLER thought he could clear her going to starboard—and he almost did. Had HI-WAL increased its speed slightly, the collision probably would not have occurred. That is all problematical or hindsight. HI-WAL's swing to port was a fast one. SEA-RAMBLER was required to act quickly. The master of SEA-RAMBLER was required to act *in extremis*.

Similar argument was advanced in White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419, 422, 82 A.L.R.2d 757 (4th Cir. 1960). The Court disposed of that contention with this statement:

It may seem to those who calmly examine the evidence long after the collision occurred that it might have been avoided if the ship had not undertaken these maneuvers, or had gone astern, but it is manifest that the movements were taken under the stress of imminent danger in the exercise of the best judgment of the men in charge as to how a collision might be avoided, and hence there is presented the typical situation of action in extremis which abundantly supports the conclusion of the District Judge that under the familiar rule no liability should be imposed upon the ship. See The Ludvig Holberg, 157 U.S. 60, 70, 15 S.Ct. 477, 39 L.Ed. 620; A. H. Bull S. S. Co. v. United States, 2 Cir., 34 F.2d 614; Pacific-Atlantic S. S. Co. v. United States, 4 Cir., 175 F.2d 632, 640, certiorari denied. 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532; Green v. Crow, 5 Cir., 243 F.2d 401, 403.

Until it became apparent to the master of SEA-RAMBLER (or should have become apparent to a reasonably prudent person, exercising due care) that the HI-WAL was not going back on course, or was in difficulty, he was not required to act. Certainly, up to that moment, he was not required to anticipate anything wrong. A similar situation was disposed of by Chief Judge Hoffman of this Court in Skibs Aktieselskapet Orenor v. The Audrey, supra, where at page 703 of 181 F.Supp. he said:

For the Moisie Bay to so assume and thereby engage in avoiding action would, as has been so frequently said, reduce navigation to a game of bluff. Hellenic Lines v. The Exmouth, 2 Cir., 253 F.2d 473, 476, certiorari denied 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074; Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; Pacific-Atlantic S. S. Co. v. United States, 4 Cir., 175 F.2d 632. A mere error of judgment forced upon

the privileged vessel by the fault of the burdened vessel is not sufficient where the circumstances are such as existed here, and any doubt as to the propriety of the navigation of the Moisie Bay should be resolved in her favor. Compania DeNavegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 200 F.2d 643; Nicolas Eustathiou & Co. v. United States, D.C., 178 F.Supp. 33, 40; Griffin on Collision, § 51(4) p. 153.

What was said in Paco Tankers v. The Rodas, etc., 80 F.Supp. 587, 588 (D.C. N.Y.1948), is particularly applicable here:

> With her faults so plainly made out, it it not surprising that the Rodas should search the conduct of the Charles Kurz in an effort to find some flaw which would mitigate her own liability.
>
> \*   \*   \*   \*   \*   \*
>
> It seems unreasonable to attribute to the Kurz such premonition that a second column vessel should suddenly decide to cut across the convoy on a 90° turn.

In The City of New York, 147 U.S. 72, at page 85, 13 S.Ct. 211, at page 216, 37 L.Ed. 84, the Court said:

> So far as the case of the barque is concerned, there was evidently testimony to support the findings of the circuit court, and if these findings are consistent, and justify its conclusion of law that the barque's change of course was an error *in extremis,* we cannot do otherwise than affirm the decree. In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence on the part of the sailing vessel should be clear and convincing. Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt

with regard to the propriety of the conduct of such other vessel should be resolved in its favor.

The above language was quoted with approval and applied in White Stack Towing Corp. v. Bethlehem Steel Co., supra; Skibs, etc. v. The Audrey, supra; Webb v. Davis, supra; Compania Nacional De Navegacao, etc. v. Cabins Tanker Industries, Inc., 285 F.2d 592 (4th Cir. 1961). In this last cited case, at page 593, the Court said:

> It is urged, on behalf of the Rio Maracana, that more effective efforts should have been taken to avoid the collision by retarding the engines or changing the course of The Cabins before her navigators realized that otherwise a collision was imminent. But we think the reasons given by the district judge in discussing the facts in his opinion justify his conclusion that negligence on the part of The Cabins in the emergency caused by the maneuvers of the Rio Maracana was not proved. The case is a typical one for the application of the established rule that when the fault on the part of one vessel in a collision, sufficient to account for the disaster, is established by uncontroverted proof it is not enough to raise doubts about the management of the other vessel, but in order to hold her liable there must be proof of fault beyond a reasonable doubt. White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir., 279 F.2d 419; The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84.

What the Court said in Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., Ltd., supra, 301 F.2d at page 62, is particularly appropriate here:

> The result is to find Elene not moving at 2149. The crash occurred between 2150 and 2151. Therefore, Atlas had only a minute for evasive maneuver. The action taken as Elene bore down upon her is not condemned. The seamanship is unquestioned, albeit unsuccessful because tardy. But it was not too late because of Atlas' want

of watchfulness or lack of vigilance. Collision course was forced upon her. Elene attempts to implicate Atlas through attributing fault to her, i. e. failure to avoid the ramming. But, as Elene's negligence was wantonly gross, she had the burden to prove Atlas *particeps*. However, she does not " 'more than suggest the possibility' ". Bradshaw v. The Virginia, 176 F.2d 526, 530 (4 Cir., 1949). There this court in circumstances not unlike the instant facts said through Judge Dobie,

> "It has long been the rule that where one vessel, in violation of statute, is as grossly at fault as was the Greenwell here, that Vessel will be held *solely* at fault unless the evidence to establish the fault of the other vessel is clear and indisputable. Cf. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; Taylor v. Harwood, 23 Fed.Cas. [p. 773] No. 13,794."

The evidence is not that persuasive here.

See also Long Island R. Co., et al. v. Killien, 2 Cir., 67 F. 365, 367, where the Court said:

> He deliberately chose a course which in his judgment at the time was sufficiently outside the tug's course to be a safe and prudent one. We think his judgment, formed under such circumstances, was not a rash one, or one which should be pronounced erroneous merely because subsequent events have shown that there would not have been a collision if he had pursued a course further to port.

■ Fault having been admitted by the HI-WAL, which in and of itself is sufficient to account for the collision, the evidence does not show that the alleged fault of the SEA-RAMBLER proximately caused or contributed to the collision.

### LIMITATION OF LIABILITY

Having reached the conclusion that HI-WAL is at fault—it being admitted as well as shown by the evidence —and that the SEA-RAMBLER was not guilty of fault proximately causing or contributing to the collision, we turn lastly to the issue of limitation of liability filed by the HI-WAL. Since the HI-WAL was a total loss, if its limitation of liability is established, the matter would end here. I do not believe it is entitled to the benefit of the provisions of 46 U.S.C. §§ 183–189.

■ We commence with the proposition that the burden of proof is on the one seeking the benefits of the limitation of liability. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; The Severance, 152 F.2d 916, 922, 4 Cir.

■ The plaintiff testified he had knowledge that the automatic pilot would "jump out of gear." It had happened when he was aboard. Numerous repairs had been made to it without correcting the difficulty. He knew when it jumped out of gear, it would swing to port. To his knowledge it had happened a half dozen times. Just a month before the collision he had work done on it. The master testified it became disengaged four or five times on the trip, just prior to the collision. Even after the repairs were made about a month prior to the collision, there was considerable difficulty with it. Since difficulty had been experienced with the automatic steering, plaintiff cannot say he did not have knowledge of it. He is responsible for the seaworthiness of his vessel.

In Petition of Midwest Towing Company, Inc., 203 F.Supp. 727, 729 (D.C. Ill.1962), it is said:

> Before the petitioner is entitled to limit its liability, it must first be shown that the ship was seaworthy for it is clear that there can be no limitation of liability where the owner of a ship knew or should have known that a ship was unseaworthy due to some unsafe condition or was improperly equipped or manned and a loss of life or injury results therefrom.
>
> \*　　\*　　\*　　\*　　\*　　\*

Under the Limitations Act (46 U.S.C.A. § 183) the shipowner is not chargeable with privity or knowledge or with design or neglect when he has used due diligence to furnish a seaworthy ship, but he is so chargeable when he has failed in his duty of due diligence and has sent out a ship unseaworthy in some respect that proximately contributes to the loss. States Steamship Company v. United States, 259 F.2d 458 (9 Cir. 1958).

The measure of knowledge and what he is chargeable with is set out in Avera v. Florida Towing Corporation, 322 F.2d 155, 166 (5th Cir. 1963), where it is said:

With the duty to make inquiry "the measure" of the knowledge "is not what the owner knows, but what he is charged with finding out." Great Atlantic & Pacific Tea Co. v. Brasileiero, 2 Cir., 1947, 159 F.2d 661, 665, 1947 AMC 306. For " * * * knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." The Cleveco, 6 Cir., 1946, 154 F.2d 605, 613, 1946 AMC 933.

And in China Union Lines, Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 787 (5th Cir. 1966), the Court said:

Privity and knowledge are deemed to exist where the owner had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection. Knowledge or privity of supervisory shore personnel is sufficient to charge a corporation. The judge in holding that there was privity and knowledge on the part of China Union and in denying limitation was well within the standards applied in Avera v. Florida Towing Corp., 322 F.2d 155 (5th Cir. 1963).

See also Rowe v. Brooks, 329 F.2d 35, 46 (4th Cir. 1964), where the Court said:

In Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189, petitioner owned a deck scow and chartered his boat by oral contract to respondent. Following the demise, the scow capsized and dumped her cargo. Respondent, as bailee of the cargo, sued petitioner as owner of the scow. Petitioner sought limitation of liability under the provisions of 46 U.S.C.A. § 183, but the District Court, finding that the scow was unseaworthy at the time of the demise, refused limitation of liability. The Court of Appeals concurred in this finding, and affirmed the trial court's decision "upon the ground that as the charter was the personal contract of the owner and included an implied warranty of seaworthiness the petitioner was precluded from the benefit of the limitation statutes." The court said (290 U.S. p. 88, 54 S.Ct. p. 11, 78 L.Ed. 189):

"we pass, without discussion, the contentions that the court below erred in its rulings that the owner's contract was personal and that the respondent as bailee of the cargo was entitled to recover from the charterer, as we are of opinion that both points were correctly decided (The Benjamin Noble [D.C.], 232 F. 382; Id. (C.C.A. 6) 244 F. 95; Capitol Transportation Co. v. Cambria Steel Co., supra [249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631]; Pendleton v. Benner Line, supra, [pages] 355–356 [of 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770]), and come to the question of petitioner's right of limitation notwithstanding the implied warranty of seaworthiness. The Capital Transportation Case is an authority against the right. As appears by the opinion of the District Court (The Benjamin Noble, 232 F. 382), the contract of the owner in that case was oral and no express warranty was given.

"We see no reason to restrict or modify the rule there announced. The warranty of seaworthiness is implied from the circumstances of

the parties and the subject-matter of the contract and may be negatived only by express covenant. It is as much a part of the contract as any express stipulation. Delaware & Hudson Canal Co. v. Penna. Coal Co., 8 Wall. 276, 288, 19 L.Ed. 349; Grossman v. Schenker, 206 N.Y. 466, 469, 100 N.E. 39; United States v. [A.] Bentley & Sons Co. [D.C.], 293 F. 229."

In Rowe v. Brooks, supra, the Court quoted from Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291. From page 410 of 317 U.S., page 293 of 63 S.Ct., the Court says:

Petitioners press several lines of cases on us. We are not concerned here, however, with the question of limitation of liability where the loss was occasioned by the unseaworthiness of the vessel. The limitations acts have long been held not to apply where the liability of the owner rests on his personal contract. Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330; Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170; Capitol Transportation Co. v. Cambria Steel Co., 249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631. As stated by Chief Justice Hughes in American Car & Foundry Co. v. Brassert, 289 U.S. 261, 264, 53 S.Ct. 618, 619, 77 L.Ed. 1162, "For his own fault, neglect and contracts the owner remains liable." And that exception extends to an implied as well as to an express warranty of seaworthiness. Cullen Fuel Co., Inc., v. W. E. Hedger Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

\* \* \* \* \* \*

Some cases, however, have barred the individual owner from the benefits of the statute even though the element of personal participation in the fault or negligence was not present. Thus it has been thought that the scope of authority delegated by an individual owner to a subordinate may be so broad as to justify imputing privity (In re New York Dock Co., supra [2 Cir., 61 F.2d 777], page 779) as well as knowledge. In re Great Lakes Transit Corp., supra [6 Cir., 81 F.2d 441], page 444. We need not reach those questions in this case. Privity like knowledge turns on the facts of particular cases.

Plaintiff, failing to carry his burden, is not entitled to the benefits of limitation of liability.