730 F.2d 159
 1984 A.M.C. 2713
 In the Matter of the Complaint of HELLENIC LINES, LIMITED,
as owner of the M/V HELLENIC CARRIER, for
exoneration from or limitation of
liability, Appellee,
v.
PRUDENTIAL LINES, INC., Appellant,
and
General Poultry Corporation; American Motorists Insurance
Company; Fireman's Fund Insurance Company; Insurance
Company of North America; St. Paul Fire & Marine Insurance
Company; Biderman Insurance Company Ltd.; Sela; Ihud
Insurance Agencies Ltd. on behalf of underwriters; Hamagen;
Migdal; Menorah; Sahar; Hassneh; Arrarat; Arye; Home;
Assicurazioni Generali; Norwich Union Fire Insurance
Society Limited; Central National Corporation; Pakistan
Papersack Corp., Ltd.; Habib Bank Ltd.; Ekman Co.;
Adamjee Insurance Co.; Premier Insurance Co., Ltd.; W.K.
Webster & Co.; American & Far Eastern Trading Co.;
Albany-Atlas Group; Jawad Cold Stores; Pakistan Peper
Corporation; Deitrich Industries; Mohammed Ahmed Jamil
Ahmed; Metal Impex; Asian Agencies; Royal Steel Agencies;
Steel Scrap Traders; Union Bank of Middle East, Ltd.;
United Bank Ltd.; Leyden Shipping Co.; John S. James
Company; Karr, Ellis & Co., Inc.; Poseiden Freight
Fowarders; National Bank of Pakistan; Southern Steamship
Agency, Inc.; Chevron Shipping Company; Caltex (Asia)
Ltd.; American International Marine Agency; New Hampshire
Insurance Company; Granite State Insurance Company; Philip
Morris Incorporated; I.S.C.E. Terra; Prestagent Egyptian
Marketing & International Trade; Royal Globe Insurance
Company; Great American Insurance Companies; Commercial
Insurance Companies; The Hartford Insurance Group; The
Hartford Fire Insurance Company; Talbot, Bird & Co., Inc.;
New Zealand Insurance Company; Northwestern National
Insurance Company; Eagle Star Insurance Company; The
Atlantic Companies; Atlantic Mutual Insurance Company;
Centennial Insurance Company; Tokio Marine Management,
Incorporated; Tokio Marine and Fire Insurance Company,
Limited; Lloyd's Underwriters; A.M.E. International, Inc.;
Intercon, Inc. t/a Outer Banks Fishing Pier; The Ministry
of Supply of the Arab Republic of Egypt and its
underwriters; Commercial Insurance Company of Newark;
Continental Insurance Company; Clal Insurance Company;
Halvenon Insurance Company; Isreal Phoenix Assurance Co.,
Ltd.; General Insurance Company; Kaplan Nalo & Co.;
Peltours Insurance Company; Securitas Insurance Company;
Fidelity and Casualty Company of New York; Afia Insurance
Company, Defendants.
 No. 82-2071.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 10, 1983.
Decided March 22, 1984.
 
 Robert M. Hughes, III, Norfolk, Va. (Glen A. Huff, William L. Peck, Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellant.
 Melvin J. Tublin, New York City (John J. Devine, Jr., Poles, Tublin, Patestides & Stratakis, New York City, R. Arthur Jett, Jr., Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., on brief), for appellee.
 Before HALL and CHAPMAN, Circuit Judges and WYZANSKI, District Judge.*
 CHAPMAN, Circuit Judge:
 
 
 1
 This case arises out of the collision between the M/V Hellenic Carrier (the Hellenic) and the S/S Lash Atlantico (the Atlantico) in international waters off the coast of North Carolina. The district court apportioned 80% of the fault for the collision to Prudential Lines, Inc., owner of the Atlantico, and 20% to Hellenic Lines, Ltd., owner of the Hellenic. The district court also found that Hellenic Lines was entitled to limit its liability, pursuant to 46 U.S.C. Sec. 183 (1976), to its interest in its vessel and the vessel's freight. Prudential Lines appeals both the apportionment of fault and the limitation of Hellenic Lines' liability. For the reasons stated below, we remand the case to the district court for further consideration of the apportionment of liability in accordance with our interpretation of Rules 7 and 19(d)(i) of the International Regulations for Preventing Collisions at Sea, 1972, 28 U.S.T. 3459, T.I.A.S. 8587 (hereinafter cited as 72 Colregs) and to reconsider the matter of limitation of liability in light of this court's interpretation of Rule 7.
 
 
 2
 * The Hellenic and the Atlantico collided on May 6, 1981 at approximately 0700 hours. The approximate position of the collision was 36? 15' North Latitude and 75? 34' West Longitude. Although both vessels incurred substantial structural damage, the collision did not result in the loss of life.
 
 
 3
 The district court made numerous findings of fact, which are summarized below.
 
 
 4
 Both vessels were equipped with radar. Atlantico had both a starboard and a port radar but both radars were faulty and found to be functionally inoperable at the time of the collision. The Hellenic carried only one radar but it was fully operable at the time of the collision.
 
 
 5
 The Hellenic was en route from Savannah, Georgia to Baltimore, Maryland and the Atlantico was en route from Newport News, Virginia to Charleston, South Carolina. At 0640, the Hellenic was proceeding on a course of 338? true at a speed of 14 knots in restricted visibility, and the Atlantico was proceeding on what its radar showed to be a course of 161? at a speed of 18 knots in restricted visibility. Weather was calm, with intermittent fog, limiting visibility to 500 to 1000 feet.
 
 
 6
 Chief Mate Konstantinos T. Rentas was the watch officer on the bridge of the Hellenic from 0400 until the time of the collision. At 0640,[1] Rentas observed a radar contact forward of the ship's beam at a distance of 12 miles, approximately 10? off the starboard of the Hellenic. At 0645, he ordered the course of the Hellenic changed to port from 338? to 330? to increase the passing distance between the vessels.
 
 
 7
 Approximately two minutes before the collision, the boatswain, who had been assigned as lookout on the starboard bridge wing of the Hellenic, heard two whistles from an approaching vessel. Approximately one minute before the collision, Rentas observed that the oncoming vessel was less than one mile from the Hellenic and that it was approaching the Hellenic on the starboard beam. At this point Rentas ordered a full port turn but it was too late to prevent the collision.
 
 
 8
 The crew of the Atlantico first observed the Hellenic on radar at 0650 when Paul Ticer, the second mate, observed a target at a distance of five miles and bearing 8? to 10? on what he believed was his port bow. The district court found, and Prudential Lines does not dispute, that this assessment was incorrect because the readings were taken from the Atlantico's unreliable starboard radar. The district court found that the Hellenic was actually about 5? to 7? on the Atlantico's starboard bow.
 
 
 9
 At approximately 0653, Captain Nicholas Tittonis ordered the Atlantico to change course four degrees to what he believed was 165?. From 0654 to 0659, Captain Tittonis ordered several small course changes to the starboard.
 
 
 10
 At approximately 0659, the Hellenic became visible to the occupants of the Atlantico's bridge. About 35 seconds before the collision Captain Tittonis ordered the rudder hard right and the engines stopped.
 
 
 11
 The district court found that, in the minutes before the collision, neither vessel attempted to communicate with the other and the Hellenic failed to sound any fog signals. The court also found that neither vessel slackened its speed, although both vessels were proceeding in restricted visibility.
 
 
 12
 The district court concluded that sixty percent of the fault for the collision was attributable to Prudential Lines for its failure to outfit the Atlantico with functional radar and that twenty percent was attributable to Prudential for the failure of the Atlantico to reduce its speed. The court apportioned the remaining twenty percent to Hellenic Lines for the failure of the Hellenic to reduce its speed.
 
 
 13
 Finally, the court allowed Hellenic Lines to limit its liability to the value of its interest in the Hellenic and her freight, pursuant to 46 U.S.C. Sec. 183 (1976), because the court found that the cause of the collision attributable to the Hellenic was not within the privity or knowledge of Hellenic Lines.
 
 II
 
 14
 Prudential attacks both the district court's apportionment of liability between the two parties and the court's holding that Hellenic was entitled to a limitation of liability. We will address first the apportionment of liability between the parties.
 
 
 15
 Appellant argues that the court below erred in three instances by failing to assign fault to Hellenic Lines for the Hellenic's violations of the 72 Colregs. First, it asserts the district court erred in not finding the Hellenic at fault for her admitted failure to sound fog signals in violation of Rule 35(a) of the 72 Colregs.
 
 
 16
 There is no dispute that the Hellenic neglected to give fog signals in the minutes before the collision and that this omission was a violation of Rule 35(a). The only dispute is whether the district court properly applied the "Pennsylvania Rule" in determining that there was no causal relationship between the collision and the Hellenic's failure to give fog signals.
 
 
 17
 The "Pennsylvania Rule" is derived from The Pennsylvania, 86 U.S. 125, 19 Wall 125, 22 L.Ed. 148 (1873):
 
 
 18
 When ... a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions ... the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.
 
 
 19
 The district court concluded that Hellenic Lines had met its burden under the "Pennsylvania Rule" of showing that the absence of fog signals could not have contributed to the collision. Our review of the record convinces us that this finding is not clearly erroneous. There was expert testimony before the court that in the circumstances of this case, the sounding of a fog signal by the Hellenic would not have provided the Atlantico with any warning of the presence and location of another ship which had not already been provided by the Atlantico's radar, even though the radar was defective.III
 
 
 20
 Prudential contends that the district court should have found the Hellenic at fault for failing to make proper use of its radar, as required by Rule 7 of the 72 Colregs. Rule 7(b) states that "proper use shall be made of radar equipment if fitted and operational, including long range scanning to obtain early warning of risk of collision and radar plotting, or equivalent systematic observation of detected objects." (emphasis added)
 
 
 21
 Although it is clear from the evidence that Chief Mate Rentas did not employ plotting in tracking the position of the Atlantico, the district court found that the Hellenic had not violated Rule 7 because Rentas employed a method of observation known as "parallel indexing" which the court found to be "equivalent systematic observation" within the meaning of Rule 7.
 
 
 22
 We hold that "parallel indexing" is not "equivalent systematic observation" to radar plotting, because it is not equivalent or reasonably equal to radar plotting. Hellenic's own expert, Captain Slack, testified that "parallel indexing" was not equivalent to radar plotting because "parallel indexing" does not give the relative motion, course and speed of the other vessel. It provides only the closest point of approach. A system that does not provide information as to the course, speed and relative motion of an approaching vessel cannot be the equivalent of a system that does.
 
 
 23
 No court has yet addressed the question of what constitutes "equivalent systematic observation." However, A Cockcroft & J. Lameijer, who assisted in drafting the 72 Colregs, are authors of A Guide to the Collision Avoidance Rules, 2d edition (1976) which was introduced into evidence at the request of the trial judge, and state at page 56 of this text:
 
 
 24
 Plotting or equivalent systematic observation
 
 
 25
 Even continuous observation by a competent person is unlikely to be accepted as proper use of radar to obtain early warning of risk of collision if the bearings and distances of approaching vessels are not taken at regular intervals and carefully evaluated by plotting or by some equivalent method.
 
 
 26
 (Emphasis added).
 
 
 27
 Knight's Modern Seamanship, which has been the standby of mariners for generations, in its 16th edition (1977) states at page 566:
 
 
 28
 The radar plot required by the International Rules includes a radar deflection plotter fitted over the scope, as well as plotting directly on the scope. "Systematic observation" includes the plotting teams used on most naval vessels as well as computerized collision avoidance systems which process radar bearings and range data and display information on a cathode ray tube.
 
 
 29
 The trial court found that there was no violation of Rule 7 because watch officer Rentas was competent to plot. However, it is clear from Rentas' own testimony that he did not plot and he testified that he did not know how to plot. Accordingly, we find that the district court was clearly in error when it found that the Hellenic did not violate Rule 7 by failing to make proper use of its radar. The Hellenic violated Rule 7 because its "parallel indexing" does not qualify as "equivalent systematic observation" under the Rule.
 
 IV
 
 30
 Prudential's final argument against the district court's apportionment of fault is that the court erred in not holding the Hellenic to be in violation of Rule 19(d)(i) of the 72 Colregs for its two left turns in the minutes before the collision. Rule 19 regulates the conduct of vessels not in sight of one another when navigating in restricted visibility. The applicable portion of the rule states as follows:
 
 
 31
 (d) A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collision exists. If so, she shall take avoiding action in ample time, provided that when such action consists of an alteration of course, so far as possible the following shall be avoided:
 
 
 32
 (i) An alteration of course to port for a vessel forward of the beam, other than for a vessel being overtaken;
 
 
 33
 It is clear from the record that the Hellenic detected the Atlantico's presence through the use of radar alone and that the Hellenic altered course to port twice during the time before the collision, once at 0645 by 8? and once immediately before the collision. The district court excused the first turn to port because it found that a "close quarters" situation was not developing and because it interpreted the rule as not prohibiting left turns but only advising against them. The district court excused the second turn because it was made "in extremis" and because it was made too late to be a cause of the collision.
 
 
 34
 Initially we consider the district court's determination that a close quarters situation was not developing. What constitutes close quarters is not defined in Rule 19 and must be determined in each case primarily upon the location of the vessels and the space in which they have to maneuver. See A. Cockcroft & J. Lameijer, A Guide To The Collision Avoidance Rules p. 129 (2d ed. 1976). Although the district court made no specific finding on what distance constituted close quarters in this case, it is clear from the fact that a collision occurred and the testimony of Captain Slack that any passing distance under two miles is close quarters in a fog.
 
 
 35
 The district court found that the two vessels were set up to pass at a distance of two miles when the Hellenic made its first turn to port. The only evidence which supports this finding is the testimony of Chief Mate Rentas of the Hellenic that the Atlantico appeared on the spot on his radar scope which indicated a passing distance of two miles at the time he ordered the first left turn at 0645. On the other hand, both the testimony of Captain Slack and the district court's own amended finding of fact No. 50 support the conclusion that the passing distance between the vessels was significantly less than two miles at 0645. Captain Slack stated that the passing distance between the two vessels was 1.1 miles after the Hellenic's first left turn. Since the parties agree that the effect of the 8? port turn was to increase the passing distance between the vessels, Captain Slack's testimony establishes that the passing distance at the time the turn was made was less than one mile. The district court's amended finding of fact states that the two vessels would have passed at a distance of 1.1 miles if they had maintained the courses they were pursuing before the Hellenic's left turn. This finding is particularly significant because it is inconsistent with the court's other finding that the vessels were set up to pass at a distance of two miles before the port turn. These two inconsistent findings indicate that the district court was confused on this crucial issue of whether a close quarters situation existed. We should therefore give less weight to the court's finding on this issue.
 
 
 36
 In light of the district court's confusion on the close quarters issue and the strong evidence that the vessels were in a close quarters situation at 0645, we are forced to conclude the court's finding that close quarters did not exist was clearly erroneous. Since the vessels were in close quarters, we must consider the meaning of Rule 19(d)(i) and whether it prohibits or only advises against port turns.
 
 
 37
 The district court interpreted the language "so far as possible" found in Rule 19 to excuse Hellenic's left turn because, the alternative, a starboard turn across the bow of the Atlantico, would have "exceeded the bounds of good seamanship." We find two problems with this interpretation. First, the district court's finding that a starboard turn at 0645 would have exceeded the bounds of good seamanship was based on the testimony of Captain Slack to that effect. However, Captain Slack's testimony was in response to hypothetical questions posed by the district court and Hellenic Lines' attorney which required Captain Slack to assume that the passing distance between the vessels was two miles. Since we have concluded that the passing distance must have been less than two miles, Captain Slack's testimony, and the district court's conclusion based on that testimony carries no weight.
 
 
 38
 The second problem with the district court's interpretation of the phrase "so far as possible" is that it has the effect of making Rule 19(d)(i) advisory instead of mandatory. Rule 19(d)(i) has been interpreted by four different courts and each has interpreted the language to prohibit port turns for vessels navigating in close quarters, in restricted visibility and not in sight of one another. Alkmeon Naviera, S.A. v. M/V Marina L, 633 F.2d 789 (9th Cir.1980); Amoco Transport Company v. S/S Mason Lykes, 550 F.Supp. 1264 (S.D.Tex.1982); The Roseline, 2 Lloyd's List L.R. 410 (Q.B.1981); The Sanshin Victory, 2 Lloyd's List L.R. (Q.B.1980).
 
 
 39
 We agree with the reasoning of these courts that Rule 19(d)(i) should be interpreted to mean that alterations of course to port should be avoided in situations where a vessel has room to maneuver and a choice of which way to turn to avoid a risk of collision. When vessels are maneuvering in close quarters, there is not usually time for each vessel to observe the action of the other and adjust its course accordingly. A vessel must be able to anticipate the actions of an oncoming vessel if it is to adequately adjust its course to avoid the risk of collision. The intent of the rule is expressed well in the following language from The Roseline:
 
 
 40
 I cannot condemn too strongly any alteration of course to port when a ship which is not in sight is approaching from ahead. Whether action is taken to avoid a close-quarters situation which is seen to be developing or to remove a risk of collision which already exists, an alteration of course to port should be avoided.
 
 
 41
 2 Lloyd's List L.R. at 417.
 
 
 42
 The entire purpose of the Colregs and particularly of its Rule 19 will be lost if it is construed to be advisory rather than mandatory. These are internationally adopted rules which are to control in ships of all nations. They must be enforced if they are to serve any useful purpose, and they must be enforced uniformly. The captain of a ship, regardless of the ship's country of registration or its port of call or the language of its crew, must be able to rely upon other ships complying with these Colregs and never turning to port when it is forward of the beam of another vessel and in a close-quarters situation. The rule is the same and must be enforced whether the ships are off the coast of North Carolina or off the coast of Borneo.
 
 
 43
 Because the Hellenic's first port turn was made when the two vessels were in close quarters and at a time when the Hellenic could have taken other action to avoid a risk of collision, we conclude that this turn to port violated Rule 19(d)(i). Since it is clear that this violation was a contributing cause of the collision,[2] the district court should have considered it as a fault of Hellenic when it was apportioning responsibility for the collision.
 
 
 44
 Appellant also argues that the Hellenic should have been held at fault for its second port turn made in the final seconds before the collision. The evidence clearly supports the district court's finding that this turn did not contribute to the collision. The uncontradicted testimony of Captain Slack was that this last turn to port was made at a time when no action by the Hellenic could have avoided the collision. Accordingly, we affirm the district court's refusal to assign fault for this second turn.
 
 V
 
 45
 We now turn to a consideration of the limitation of Hellenic Lines liability. Limitation of a shipowner's liability for losses resulting from a collision is governed by 46 U.S.C. Sec. 183(a) (1976). This statute allows the owner of a vessel to limit his liability for losses, resulting from a collision, to the value of his interest in the vessel and her freight if the owner can show that the cause of the collision was not within his privity or knowledge.
 
 
 46
 Privity and knowledge, in the sense the words are used in this statute, have been construed to mean that a shipowner knew or should have known that a certain condition existed. Puamier v. Barge BT 1793, 395 F.Supp. 1019, 1035 (E.D.Va.1974). A shipowner seeking limitation of liability bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the collision. The E. Madison Hall, 140 F.2d 589 (4th Cir.1944); Daniels v. Trawler Sea-Rambler, 294 F.Supp. 228 (E.D.Va.1968).
 
 
 47
 The district court found that Hellenic Lines had met its burden of demonstrating that it did not have privity or knowledge of the faults of the Hellenic that contributed to the collision. Prudential argues that this finding is clearly erroneous because the record clearly shows that Chief Mate Rentas was incompetent and that his incompetence was within the privity or knowledge of the Hellenic Lines.
 
 
 48
 Appellant's argument that Rentas was incompetent is based on the allegation that he was unable to "plot" the track of an oncoming vessel on radar and that he made many errors of navigation that contributed to the collision. The general rule with respect to errors in navigation or other negligence on the part of a ship's crew is that such errors do not preclude limitation of the owner's liability. Tittle v. Aldacoste, 544 F.2d 752 (5th Cir.1977); Hogge v. S.S. Yorkmar, 434 F.Supp. 715 (D.Md.1977). The district court applied this rule below and held that Hellenic Lines was without privity or knowledge of the Hellenic's excessive speed. The evidence and legal conclusions on this point should be reconsidered by the district court in light of our holding as to 72 Colregs. Rule 7(b).
 
 CONCLUSION
 
 49
 We remand the case to the district court for a reconsideration of the apportionment of fault between the parties and its limitation of Hellenic's liability in accordance with our holding that the Hellenic was in violation of Rule 19(d)(i) of the 72 Colregs and that Hellenic's use of "parallel indexing" did not comply with Rule 7(b).
 
 
 50
 REMANDED.
 
 
 
 *
 Honorable Charles E. Wyzanski, Jr., Senior United States District Judge for the District of Massachusetts, sitting by designation
 
 
 [1]
 The testimony of Hellenic Lines' expert, Captain Robert Slack, states that the clock on the Atlantico was one and one half minutes behind the clock on the Hellenic. The times used in this opinion are taken from the opinion of the district court, and that opinion does not state whether it employed Atlantico or Hellenic time
 
 
 [2]
 The Hellenic's only alternative to a turn to port at 0645 was a turn to starboard which would have put the Atlantico on its port side. Our earlier discussion has established that there is no evidence to support the district court's finding that a starboard turn would have exceeded the bounds of good seamanship